**ASPIRA OF NEW YORK, INC., et al.,**
**Plaintiffs,**

v.

**BOARD OF EDUCATION OF the CITY OF NEW YORK et al.,**
**Defendants.**

**No. 72 Civ. 4002.**

United States District Court,
S. D. New York.

Jan. 2, 1975.

Herbert Teitelbaum, Richard J. Hiller, Puerto Rican Legal Defense & Education Fund, Inc., New York City, for plaintiffs.

Adrian P. Burke, Corp. Counsel of City of New York, New York City, for defendants; James G. Greilsheimer, Doron Gopstein, Gary L. McMinimee, William A. Babiskin, New York City, of counsel.

OPINION

FRANKEL, District Judge.

Plaintiffs, for the able and effective work of their counsel in bringing this

action and conducting it to and beyond the consent decree dated August 29, 1974,[1] seek an award of attorneys' fees. Plaintiffs are Puerto Rican parents, public school children, and two non-profit corporations organized "to develop the intellectual and creative capacity of Puerto Ricans * * * by motivating [them] to continue their education in the professions, arts and technical fields so that such persons may offer their skills for the betterment of the community."[2] Their attorneys are a non-profit agency, described in its title, the Puerto Rican Legal Defense & Education Fund, Inc.

Commenced in September 1972, the suit was brought as a class action to correct the injury to many thousands of public school children who speak Spanish and little or no English and were alleged to suffer discriminatory and inadequate schooling because the instruction offered them was mainly or only in English. The educational policies complained of were said to violate the equal protection clause, other provisions of the Federal Constitution, and the right to equal educational opportunity promised in Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d. After more than a year and a half of robustly adversarial proceedings—beginning with a dubious motion to dismiss the complaint, extending through a good deal of discovery, and including other motions of substantial dimension—the parties began a course of wearing negotiations that led, after four months or so, to the consent decree. The decree is a fairly long, detailed, by no means simple one, reflecting enormous labors on both sides and providing concrete remedies for the deprivations that led to the lawsuit.

In the present application for attorneys' fees, plaintiffs rely primarily upon § 718 of Title VII, the Emergency School Aid Act, part of the Education Amendments of 1972, Pub.L. 92–318, 86 Stat. 235, 369, 20 U.S.C. § 1617, which reads this way:

"Upon the entry of a final order by a court of the United States against a local educational agency, a State (or any agency thereof), or the United States (or any agency thereof), for failure to comply with any provision of this chapter or for discrimination on the basis of race, color, or national origin in violation of title VI of the Civil Rights Act of 1964, or the fourteenth amendment to the Constitution of the United States as they pertain to elementary and secondary education, the court, in its discretion, upon a finding that the proceedings were necessary to bring about compliance, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs."

Alternatively, plaintiffs invoke nonstatutory principles allowing such awards to so-called private attorneys general. Either ground should suffice in this court's view. The application will be granted.

■ Concentrating primarily upon § 718, the court has no doubt that it justifies—indeed, probably requires, Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1974)—the award plaintiffs seek. Plaintiffs are, in any apposite and meaningful sense, the "prevailing parties." The decree gives the relief they sought, consented to only after more than a year and a half of bitter resistance that began with a contention that

---

1. With the parties' consent the court has appointed a Special Master, Morris P. Glushien, Esq., who has undertaken, as an unpaid public service, to mediate where possible, and propose determinations when necessary, in the handling of ongoing questions the decree

was known to portend. The court is aware informally that the parties and the Master have found themselves engaged already in substantial efforts of this nature.

2. Complaint, pars. 10 and 11.

the action should be rejected out of hand as insufficient on its face. It is patent, by the same token, "that the proceedings were necessary to bring about compliance * * * ." The creative and promising course of remedies outlined in the decree, for which defendants have publicly claimed credit (or blame from some ideological quarters), would never have come into being—would surely not have been approached by the time of the decree—without the insistent demands, pressures, and constructive contributions of the plaintiffs. It is true, of course, that the decree is on consent, and we all have reason to be grateful for that. It is also true that defendants resisted fiercely for more than 18 months before what they deemed a change in the law —the unanimous decision in Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L. Ed.2d 1 (1974)—seemed to generate changes of heart which, sparked by plaintiffs' motion for summary judgment and perhaps by changes of personnel, brought us to the bargaining table. But nobody contends, quite, that the case must be fought to the last ditch before § 718 can apply. The contention would be rejected in any event as an absurd requirement to promote intransigent litigation.

Defendants do not question directly any of the foregoing propositions. It might have been hoped, therefore, that the Board of Education, serving this great and ethnically diverse City, would agree that plaintiffs "be recognized as having rendered substantial service both to the Board itself, by bringing it into compliance * * * , and to the community at large by securing for it the benefits assumed to flow from a nondiscriminatory educational system." Bradley v. Richmond School Board, 416 U.S. 696, 718, 94 S.Ct. 2006, 2019, 40 L.Ed.2d 476 (1974). Instead, defendants oppose the application. As grounds for their position, they mount arguments that are not imposing.

■ It is urged, for one thing, that § 718 applies only to school desegregation cases. This is at odds with the statute's plain language, which we are permitted to consult. This is, tracking the words of § 718, an action "for discrimination on the basis of * * * national origin in violation of title VI of the Civil Rights Act of 1964 * * * ." Lau v. Nichols, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The word "discrimination" is obviously broader than "segregation." There is not the slightest justification for narrowing it as defendants propose. Their position derives no support of consequence from shorthand dicta like that in Bridgeport Guardians, Inc. v. Members of Civ. Serv. Com'n, 497 F.2d 1113, 1115 n. 2 (2d Cir. 1974), observing that § 718 "expressly authorizes the recovery of attorneys' fees *in school desegregation suits* * * * ." (Emphasis added.) The words here emphasized were brief and descriptive enough for their context; there is no reason to read them, in our wholly different context, as excluding other kinds of discrimination claims from the coverage of § 718.

This conclusion from the words of the statute is not impaired, but may be slightly buttressed, by the competing quotations the parties offer from the Congressional Record. It seems unnecessary to reproduce the excerpts here. The statute plainly applies.

■ Arguing that if the statute is applicable the court should deny attorneys' fees as an exercise of discretion, defendants stress that (1) this was not an open-and-shut case when it was brought, so that resistance was justifiable, (2) they interposed their defensive positions in good faith, and (3) the court commended *both sides* when the consent decree was signed. These several assertions may be accepted as accurate, but they make no difference for the question at hand. A showing of bad faith is not required for the award

plaintiffs seek. Johnson v. Combs, 471 F.2d 84, 86 (5th Cir. 1972), cert. denied, 413 U.S. 922, 93 S.Ct. 3063, 37 L.Ed.2d 1044 (1973) ; see Northcross v. Memphis Board of Education, 412 U.S. 427, 428, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1974). As to defendants' constructive efforts in the few months before the consent decree, the court reaffirms its commendation. Nevertheless, however positive we may wish to be and whatever the naiveté of judges, the defendants must surely recall the long and sometimes bitter times before the era of good feelings set in. This is not a subject the court desires to dwell upon now or, if possible, ever. It should be sufficient to remind everyone, without detailed documentation, that even though 18 or 20 months of struggle and a motion for summary judgment led to negotiations for a consent decree, there were bargaining sessions when the court was driven to speak as more than a "mere moderator," Quercia v. United States, 289 U.S. 466, 469, 53 S.Ct. 698, 77 L.Ed. 1321 (1933), occasions when the Board was chided for what seemed tardy and grudging concessions, and a penultimate stage at which the Board's adversary passion led to blatant infringement of first amendment rights. To the very end, it must be said, steady and energetic pressure by plaintiffs' attorneys was required so that pertinent information and responsive proposals would be forthcoming on a reasonably prompt and orderly schedule.

The court wishes to retract nothing of its appreciation for defendants' affirmative contributions. At the same time, there can be no question of the "necessity," in any realistic and apposite sense, served by plaintiffs in their bringing and vigorous prosecution of the action. It is perfectly clear that the "compli-

ance" achieved in this case would not have happened, certainly not as early or as thoroughly as it has, without the initial and continued impact of plaintiffs' action.

■ There is an argument by defendants that an Appellate Division rule governing legal services organizations including the Puerto Rican Legal Defense & Education Fund, Inc., "does not authorize" this Fund's receipt of any "fee or compensation," and that this should preclude the award plaintiffs seek unless "specifically provided in the order of the Appellate Division." [3] It ought to be enough to mention comity, let alone the Supremacy Clause; defendants can scarcely mean that the federal court, administering federal law, must seek a state court order before granting an application like the one here presented. See Jordan v. Fusari, 496 F.2d 646, 649 n. 3 (2d Cir. 1974).[4]

The court concludes, in sum, that the application for attorneys' fees should—probably must—be granted. If the matter lay in substantially unfettered discretion, the balancing of factors—the degree and length of defendants' resistance, the character of the obstacles plaintiffs met, the magnitude of plaintiffs' contribution to the good of the class they represented and of the public at large—would lead to this conclusion. But the leeway for decision is narrower; the governing statute requires the giving of " 'an attorney's fee unless special circumstances would render such an award unjust.' " Northcross v. Memphis Board of Education, supra, 412 U.S. at 428, 93 S.Ct. at 2202, quoting and holding applicable under § 718 the principle stated in Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, 88 S.Ct.

---

3. Rules of Practice of the Appellate Division, First Department, N.Y. Court Rules, § 608.7 (b) (McKinney's 1973).

4. Of course, this court takes no position as to what the Fund may or must do to stay in compliance with the rules of the Appellate

Division. It is merely our duty to adjudicate on a prayer for relief that has been in the case from the very beginning. In ruling the question under the applicable federal law, this court must assume that the courts of New York State would not do otherwise.

964, 19 L.Ed.2d 1263 (1968). There are no countervailing circumstances of that nature.

The parties should seek with dispatch to agree upon the amount to be awarded to plaintiffs. If there is such agreement, it should be embodied in an order for the court's signature, reserving, of course, any right defendants may have to press on appeal the view that there should be no award at all. If there is no agreement on the amount, plaintiffs will submit a documented claim on or before January 29, 1975, to which defendants will respond on or before February 10, 1975.